**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SARAH CARLSON　　　　　　　　　　*  | |
| 　　　　　　　　　　　　　　　　　　* | |
| 　　　Plaintiff,　　　　　　　　　　　* | |
| 　　　　　　　　　　　　　　　　　　* | |
| 　　　v.　　　　　　　　　　　　　　* | Civil Action No: 18-01018 (RBW) |
| 　　　　　　　　　　　　　　　　　　* | |
| CENTRAL INTELLIGENCE AGENCY   * | |
| 　　　　　　　　　　　　　　　　　　* | |
| 　　　Defendant.　　　　　　　　　　* | |

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

**PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS**
(Request For Oral Arguments)

Plaintiff Sarah Carlson ("Carlson") brought this action under the First Amendment to the U.S. Constitution to challenge the propriety of classification redactions made to her manuscript, initially titled "*Unnecessary Risk*" and renamed "*In the Dark of War: A CIA Officer's Inside Account of a Full Evacuation*" ("Manuscript"), as well as to an employment resume, and ensure that she was permitted to lawfully publish these documents with as much information as permitted under the law. Having secured an acceptable resolution of the substantive challenge to the redactions made by defendant agency Central Intelligence Agency ("CIA"), Carlson now seeks reimbursement for attorney's fees and costs incurred during the course of this litigation.

For the reasons set forth in detail below, Carlson's Motion for Attorney's Fees and Costs ("Motion") should be granted.[1]

---

[1] This Court should be aware that on November 27, 2018, the undersigned filed a virtually identical Motion that is currently pending in Bakos v. CIA, Civil Action No. 18-00743 (D.D.C.)(RMC), which is also a prepublication review challenge.

**FACTUAL BACKGROUND**

In or around October 2015, Carlson submitted her Manuscript, which then had the working title "*Unnecessary Risk*", to the CIA's Publication Review Board ("PRB") for classification review. The Manuscript describes her time serving in and escape from a devolving hostile environment in a country on the African continent. It focuses primarily on the final crisis situation and emergency actions taken to reach safety and save American lives. Complaint at ¶5 (filed May 1, 2018), Dkt. #1; Declaration of Mark S. Zaid at ¶12 (dated December 11, 2018)("Zaid Decl"), attached as Exhibit "1"

Over the subsequent thirteen months, Carlson worked in good faith with the PRB to address classification concerns raised with respect to the draft of her Manuscript. Complaint at ¶6; Zaid Decl. at ¶13. By e-mail dated November 15, 2016, the PRB confirmed that it had approved the final language of the Manuscript, and that Carlson had the permission of CIA to publish it. Complaint at ¶7; Zaid Decl. at ¶13.

In January 2017, Carlson submitted to the PRB for review a revised version of the Manuscript, which now had a different name. Complaint at ¶8; Zaid Decl. at ¶14. By e-mail dated February 3, 2017, the PRB informed Carlson that the rewritten version of the Manuscript had been approved for publication. Complaint at ¶9; Zaid Decl. at ¶14.

But in September 2017, the CIA changed Carlson's status. That same month, Carlson signed with a literary agent and discussed the contours of the approved version of her Manuscript. After discussions with the literary agent, Carlson revised the Manuscript again to include additional facts that had not been previously addressed, including her thoughts about a high-profile attack that occurred in her assigned country prior to her

arrival and more details about her personal background. Complaint at ¶10; Zaid Decl. at ¶15.

On October 10, 2017, Carlson submitted the modified version of the Manuscript to the PRB for review. Complaint at ¶11; Zaid Decl. at ¶16. On November 1, 2017, Carlson participated in a conference call with PRB officials regarding the status of her submission. The PRB informed Carlson that it was reversing its prior determination with respect to the classification of certain facts, and that a formal letter with guidance would be sent to her. Complaint at ¶12; Zaid Decl. at ¶16.

By letter dated November 15, 2017, the CIA informed Carlson that the entire manuscript reveals classified information. The letter stated that the PRB was denying approval for publication of the Manuscript in any form. Complaint at ¶13; Zaid Decl. at ¶17. Exhibit "2". No further communication prior to the filing of this lawsuit occurred.

*The Resume*

In June 2015, Carlson submitted to CIA a copy of her resume for prepublication review, shortly before her resignation. She had served as a Targeting Analyst with CIA's Counterterrorism Center since April 21, 2008, where she assessed terrorist groups in the Middle East and North Africa. Prior to that she served as a staff and contract Counterterrorism Analyst with the Defense Intelligence Agency, including a deployment to Baghdad, Iraq. The resume covered the entire span of her intelligence career, from May 5, 2003 to September 19, 2015. During that career, Carlson received numerous meritorious citations and exceptional performance awards for her exemplary service. Complaint at ¶14; Zaid Decl. at ¶18.

By e-mail dated September 2, 2015, the PRB informed Carlson that the prepublication review had been completed. The PRB indicated that there were specific edits that were required before approval for publication could be provided. Complaint at ¶15; Zaid Decl. at ¶19. In September 19, 2017, Carlson submitted to CIA an updated copy of her resume for prepublication review. Complaint at ¶16; Zaid Decl. at ¶19. By e-mail dated September 26, 2017, the PRB again informed Carlson of specific changes that needed to be made before approval for publication could be provided, i.e., information was still considered classified. Complaint at ¶17; Zaid Decl. at ¶19. No further communication prior to the filing of this lawsuit occurred.

Given the CIA's intractable position, Carlson was forced to initiate this litigation on May 1, 2018. Daily Beast, "The CIA Cleared Her Book Twice. Then It Took It Back. Why? It's a Secret," May 1, 2018, at *https://www.thedailybeast.com/the-cia-cleared-her-book-twice-then-it-took-it-back-why-its-a-secret*. Zaid Decl. at ¶20.

On June 25, 2018, CIA's counsel requested an extension of time for CIA to submit its Answer particularly because "[t]he CIA is reviewing Ms. Carlson's manuscript to determine whether it can reduce the redactions at issue. But it needs more time for that review before any determination can be made." Id. at ¶21. By e-mail dated July 3, 2018, CIA's counsel requested that Carlson provide an updated current version of the Manuscript as "CIA is looking over her submission once again to see whether it can agree to fewer redactions and having the entire manuscript should aid it in that process by providing context." Id. In a follow-up e-mail dated July 13, 2018, CIA's counsel informed the undersigned that "CIA anticipates that PRB will want to meet with Ms. Carlson to discuss reducing the number of redactions, but before such a meeting, it

4

wants to review the manuscript with an eye toward narrowing the redactions. The manuscript should reach PRB soon, and once it does, PRB will look the manuscript over to determine how long it anticipates that review will take." Id.

> Another update was provided by CIA's counsel by e-mail dated July 19, 2018:
>
>> CIA's re-review of this matter to date has led it to conclude that it will not seek to redact the manuscript in its entirety. CIA's PRB now has the manuscript that Ms. Carlson recently sent via FedEx and is in the process of reviewing that document to identify any necessary redactions. CIA expects that review to take approximately six weeks, in light of fact that it is now reviewing the entire draft manuscript (and not the version submitted before this lawsuit), the fact that it only recently received that draft, and expected absences from the office due to summer vacation plans.
>>
>> Because the CIA is reviewing the manuscript to identify any necessary redactions in a more targeted fashion, the agency expects that a meeting with your client after it has completed its review may be productive in resolving or reducing any issues that may be in dispute. It expects to be ready for such a meeting in early September, if that works for Ms. Carlson.

Id. at ¶22.

By letter dated September 25, 2018, CIA reversed the overwhelming majority of its prior classification decisions and notified Carlson that she could publish her Manuscript with "limited deletions required." Id. at ¶23. Exhibit "3". The following day, September 26, 2018, CIA's counsel updated the undersigned that "[b]ecause the CIA's review of the manuscript may impact the review of Ms. Carlson's resume, CIA is now turning to its review of her resume. I'm told that CIA should be in a position to communicate its determinations with respect to the resume in the next week." Zaid Decl. at ¶24. At the CIA's request, an updated resume was submitted by Carlson. It was then approved in its entirety without any redactions. Id.

In light of the fact the litigation pushed the CIA into reversing the classified redactions, Carlson indicated that she was satisfied with the result of the lawsuit and agreed to dismiss her case. Only this fee dispute remained.

## ARGUMENT

The text of the Equal Access to Justice Act ("EAJA") is very clear on the parameters in which attorney's fees and costs will be reimbursed.

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A).

### I. CARLSON IS A PREVAILING PARTY ENTITLED TO LEGAL FEES AND COSTS

Carlson should be considered as qualifying as a prevailing party. Prior to filing this lawsuit, the CIA had notified her that the entire Manuscript was classified and could not be published, and issued a similar determination with respect to her resume. The initial PRB process took *two years* of back and forth decisions that were, in fact, reversed. Now three years after Carlson submitted her Manuscript, the CIA, as a result of this lawsuit, has reversed its decision yet again, fortunately this time favorably.

It is well-settled law as to how our courts view First Amendments rights and the need for expeditious resolution of any dispute. This is particularly so because "[f]ragile First Amendment rights are often lost or prejudiced by delay." Bernard v. Gulf Oil Co., 619 F.2d 495, 470 (5th Cir. 1980), aff'd, 452 U.S. 89 (1981). In the leading case of Freedman v. State of Maryland, 380 U.S. 51, 59-60 (1965), the Supreme Court held that

providing a mechanism for prompt review is necessary to avoid offending constitutional protections. Numerous courts thereafter faced with restrictions on the content of speech have gone to great lengths to ensure that prompt judicial review was readily available. See Collin v. Smith, 578 F.2d 1197, 1209 (7th Cir. 1978)("We have endeavored to expedite decision, because to delay the exercise of First Amendment rights in itself burdens them and may risk their destruction."); Quarter Action Group v. Hickel, 421 F.2d 1111, 1116 (D.C. Cir. 1969)(noting "any delay in the exercise of First Amendment rights constitutes an irreparable injury to those seeking such exercise")(citation omitted).

The CIA has now approved Carlson's Manuscript and resume for publication. This cannot be construed as anything short of a victory for Carlson. Zaid Decl. at ¶26. The material change in the CIA's position was only accomplished due to this litigation and the CIA's interest in avoiding motions practice.

The current standard for evaluating "prevailing party" status was set forth by the Supreme Court in Buckhannon Board and Care Home, Inc. v. West Virginia Dep't of Health and Human Resources, 532 U.S. 598 (2001). The Court stated that prevailing party status requires a court-ordered change in the legal relationship between the parties, such as through judgment on the merits or settlement agreements enforced through a consent decree. Id. at 604.

The D.C. Circuit has since clarified its view of Buckhannon by stating that it will apply the standard for what qualifies as a "prevailing party" in a similar manner across fee-shifting provisions "*unless there is some good reason for doing otherwise.*" See Green Aviation Mgmt. Co., LLC v. FAA, 676 F.3d 200, 202 (D.C. Cir. 2012) (emphasis added), quoting Oil, Chem., & Atomic Workers Int'l Union, AFL-CIO v.

7

…

Dep't of Energy, 288 F.3d 452, 455 (D.C. Cir. 2002); see also Alegria v. Dist. of Columbia, 391 F.3d 262, 264 (D.C. Cir. 2004)(noting that establishing a "good reason" to depart from Buckhannon is not easily done).

This appears to be a matter of limited first impression. The courts have had occasion to apply Buckhannon to EAJA for the purpose of assessing who qualifies as a "prevailing party", see Cactus Canyon Quarries, Inc. v. Fed. Mine Safety & Health Review Comm'n & Secy' of Labor, 820 F.3d 12 (D.C. Cir. 2016); Turner v. Nat'l Transp. Safety Bd., 608 F.3d 12 (D.C. Cir. 2010), but the undersigned are not aware of any such applications in the context of a pre-publication administrative settlement prior to the filing of dispositive motions (or even the government having occasion to file an Answer to the Complaint).

Carlson respectfully submits that the circumstances of the present case satisfy the narrow "good reason" threshold. After securing a substantial material change in the CIA's position with respect to classification decisions originally imposed with respect to the Manuscript, Carlson voluntarily stipulated that the CIA be absolved of its legal obligation to file an Answer to Carlson's Complaint. See Dkt. #16 (filed October 31, 2018). This Court accepted that stipulation in a November 2, 2018, Minute Order.

It is Carlson's position that her voluntary stipulation is the legal and functional equivalent of the "dismissal with prejudice" of a complaint brought by the Federal Aviation Administration against a private third party that the D.C. Circuit found to be sufficient to satisfy the "good reason" threshold. See Green Aviation Mgmt. Co., 676 F.3d at 205; see also id. ("The dismissal order is not a mere formality or a housekeeping measure; rather it is the means by which Green Aviation can obtain *res*

8

*judicata* protection."). Just like in Green Aviation Mgmt. Co., Carlson has secured the equivalent of judicial relief by way of this Court's acceptance of her stipulation not to further pursue challenges to the remaining redactions and the CIA's agreement to reverse some of its original redaction determinations. Finding that Carlson has qualified as a prevailing party in this circumstance would be consistent with the purpose of the EAJA, which is to prevent non-government parties from "be[ing] deterred from seeking review of or defending against unreasonable government action because of the expense involved." See Green Aviation Mgmt. Co., 676 F.3d. at 205.

It took CIA two years to first process Carlson's Manuscript. After it informed her of the reversal of its earlier publication decision in that her Manuscript was now classified in its entirety, there was never any other movement or response from CIA. Indeed, in the more than two decades that lead undersigned counsel has handled prepublication review cases, many of which involved former CIA employees or contractors, he has *never* seen CIA unilaterally simply reach out to an author and inform them that it had reversed its prior unfavorable classification determinations. Yet in this instant matter, it did just that. The impetus for that decision can only be the filing of this lawsuit to protect and enforce Carlson's First Amendment rights and the knowledge/fear that its classification decisions would not be judicially sustained. Zaid Decl. at ¶27.

The reality is that if plaintiff's counsel in these types of situations cannot recover fees and costs after having to resort to litigation to compel or persuade agencies to negotiate in good faith and then successfully arrive at an amicable resolution, then plaintiffs have little to no incentive to engage in cooperative behavior. Instead, plaintiffs will simply force judicial engagement in order to obtain a final judgment. This course of action

would be a waste of judicial resources all because agencies forced a fight that never should have happened. Id. at ¶28.

## II. CIA'S POSITION WAS NOT SUBSTANTIALLY JUSTIFIED

It is the government's burden to show that its position was substantially justified. See Martin v. Lauer, 740 F.2d 36, 43 (D.C. Cir. 1984), citing Spencer v. NLRB, 712 F.2d 539, 557 (D.C. Cir. 1983). The government's position is "substantially justified" if it is "justified to a degree that could satisfy a reasonable person", i.e., that it has a "reasonable basis in both law and fact." See Am. Wrecking Corp. v. Sec'y of Labor, 364 F.3d 321, 325 (D.C. Cir. 2004). When a fee petition arises out of a proceeding for judicial review of agency action, the government must demonstrate the reasonableness not only of its litigation position but also of the agency's actions. See Role Models Am., Inc. v. Brownlee, 353 F.3d 962, 967 (D.C. Cir. 2004).

District courts have admittedly been cautioned that the government can be found to have taken a substantially justified position even if they lost on the merits, see Pierce v. Underwood, 487 U.S. 552, 569 (1988), and even if they can not demonstrate their position was based on a substantial probability of prevailing. See Spencer, 712 F.2d at 557. The evaluation to be performed by this Court must instead analyze *why* the government's position failed, such as whether it was a position at odds with controlling case law as opposed to merely an unsettled legal question. See Taucher v. Brown-Hruska, 395 F.3d 1168, 1174 (D.C. Cir. 2005).

### A. Carlson Has First Amendment Right To Publish Unclassified Information

As the D.C. Circuit has noted, Government secrecy agreements, such as executed by Carlson, do not extend to "unclassified materials or to information obtained from public

sources." McGehee v. Casey, 718 F.2d 1137, 1142 (D.C. Cir. 1983). The government may not censor such material, "contractually or otherwise." United States v. Marchetti, 466 F.2d 1309, 1313 (4th Cir.), cert. denied, 409 U.S. 1063 (1972). "[A]ny secrecy agreement which purports to prevent disclosure of unclassified information would contravene First Amendment rights." Stillman v. CIA et al., 517 F. Supp. 2d 32, 37 fn. 4 (D.D.C. 2007), citing Marchetti, 466 F.2d at 1317. Moreover, when the information at issue derives from public sources, the agent's special relationship of trust with the government is greatly diminished if not wholly vitiated." McGehee, 718 F.2d at 1141. Accord Snepp, 444 U.S. at 513 n.8 ("if in fact information is unclassified or in the public domain, neither the CIA nor foreign agencies would be concerned"); Stillman v. CIA et al., 319 F.3d 546, 548 (D.C. Cir. 2003)(if information not classified properly, manuscript can be published).

    The ability of Carlson to pre-emptively rebut factual or legal arguments the CIA can put forth to meet *its* burden to demonstrate *its* position was substantially justified is limited by the sparse written record available in an unclassified format. The entirety of the written record from the administrative process consists only of the barebones correspondence from CIA stating that the entire Manuscript was considered classified. Exhibit "2". The correspondence does not outline the substantive factual or legal bases for the CIA's position with respect to those redactions, something it arguably could not do in an unclassified letter anyway.

    There is no written record from the litigation stage of this case, beyond the initial pleadings filed bringing this matter before this Court, because CIA chose instead to conduct another substantive review and amicably resolve in a complete about face the

11

vast majority of its classification decisions so as to eliminate the need for further litigation. Zaid Decl. at ¶26.

Of course, in pre-publication review litigation the initial written record is always produced almost in its entirety by the U.S. Government in the form of unclassified exhibits and agency declarations – as well as potentially classified exhibits and agency declarations filed *ex parte* – submitted in support of the government's motion for summary judgment. See Shaffer v. Def. Intelligence Agency, 102 F. Supp. 3d 1, 7 (D.D.C. 2015); see also Stillman, 319 F.3d at 548-49 ("The district should first inspect the manuscript and consider any pleadings and declarations filed by the Government, as well as any material filed by [plaintiff."). That has not happened in the present case specifically because Carlson – as a direct outgrowth of this litigation – witnessed the CIA completely reverse its prior position. The only intervening event was this lawsuit. The undersigned has represented dozens of clients in prepublication review challenges and CIA does not voluntarily simply decide to re-review a submission, much less reverse its prior classification redactions without incentive. Zaid Decl. at ¶27.

Any prior restraint "comes to the Court bearing a heavy presumption against its constitutional validity." See Taucher v. Rainer, 237 F. Supp. 2d 7, 12 (D.D.C. 2002), quoting New York Times Co. v. United States, 403 U.S. 713, 714 (1971); see also Shaffer, 102 F. Supp. 3d at 9 ("Nonetheless, when a manuscript contains information that is unclassified, wrongly-classified, or derived from public sources, the Government may not censor such material."), citing McGehee, 718 F.2d at 1141. Carlson has sufficiently demonstrated that she secured significant material changes in the legal determinations

made by CIA at the administrative stage to such an extent that the manuscript went from completely classified to almost entirely unclassified.

The total amount of attorney's fees and costs for which Carlson is seeking reimbursement comes to $4,500.30. Zaid Decl. at ¶29 (in addition to any legal fees and costs that can be claimed as a result of the need to file this Motion).

## CONCLUSION

The evidentiary baton now falls to the CIA to respond to this Motion and outline how it can meet its factual and legal burden with respect to the substantial justification of its original position. The CIA's response should be required to include exhibits and agency declarations – both unclassified and classified – that will be somewhat similar to the type of written materials the CIA would have otherwise had to provide to this Court in the context of a motion for summary judgment. Until the CIA produces that information for review by this Court, however, Carlson need not do more than what she has already done with this Motion in order to be awarded her requested attorney's fees and costs.

Date: December 12, 2018

                                              Respectfully submitted,
                                              /s/

                                            _____
                                            Bradley P. Moss, Esq.
                                            D.C. Bar #975905
                                            Mark S. Zaid, Esq.
                                            D.C. Bar #440532
                                            Mark S. Zaid, P.C.
                                            1250 Connecticut Avenue, N.W., Suite 700
                                            Washington, D.C. 20036
                                            (202) 454-2809
                                            (202) 330-5610 fax
                                            Mark@MarkZaid.com
                                            Brad@MarkZaid.com

                                            Attorneys for the Plaintiff